# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **TAMELA RAYBON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-17-S-372-NE** |
| | ) | |
| **ALABAMA SPACE SCIENCE** | ) | |
| **EXHIBIT COMMISSION d/b/a** | ) | |
| **U.S. SPACE & ROCKET** | ) | |
| **CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Tamela Raybon sued her former employer, the Alabama Space Science Exhibit Commission, doing business as the "U.S. Space & Rocket Center," alleging claims for race discrimination, hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, as well as a supplemental state law claim for negligent hiring, retention, and supervision.[1]

Following consideration of the pleadings, defendant's motion for summary judgment,[2] briefs,[3] oral arguments of counsel, and the declaration of Vickie

---

[1] *See* doc. no. 1 (Complaint).

[2] *See* doc. no. 13.

[3] *See* doc. no. 14 (Defendant's Brief in Support of Summary Judgment); doc. no. 17 (Plaintiff's Response in Opposition to Summary Judgment); and doc. no. 22 (Defendant's Response).

Henderson filed on August 28, 2018,[4] the court enters the following memorandum opinion.

## I. SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

---

[4] *See* doc. no. 27-1.

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251–52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. FACTS

Tamela Raybon ("plaintiff") began her employment with the Alabama Space Science Exhibit Commission, doing business as the U.S. Space & Rocket Center ("the Center"),[5] in 1998, as a temporary employee in the accounting department. She processed payments for persons attending the Center's "Space Camp"[6] and performed other duties relating to accounts receivable.[7] She was hired as a full-time employee

---

[5] *See* https://www.rocketcenter.com.

[6] "Space Camp is the brainchild of rocket scientist Dr. Wernher von Braun, who led the development of the Apollo-era rockets that took America to the moon, and Mr. Edward O. Buckbee, the first director of the U.S. Space & Rocket Center. . . . Trainees cultivate teamwork, leadership, and decision-making skills through simulated missions while gaining personal and professional insights that profoundly impact their futures." https://www.spacecamp.com/about (last visited July 29, 2018).

[7] Doc. no. 15-1 (Plaintiff's Deposition: Part 1), at 15. **Note**: The documents numbered 15-1 and 15-2 together comprise plaintiff's deposition and exhibits, but were filed in two parts due to the

in 1999, and was classified as a "Camp Accounting Clerk."[8]  Her job title later was changed to "Senior Camp Accounting Clerk."[9]

The Center's accounting department was reorganized in 2007, and plaintiff was designated a "Camp Collections Manager," a position that required her to be responsible for accounts receivable, payroll processing, and customer service functions.[10]  Plaintiff's initial supervisor in the accounting department (Mildred Davis) retired in 2013, and Brenda Perez was hired to replace her.[11]

One of the goals established for plaintiff by Perez as part of her initial, January 10, 2014 performance evaluation, was:  "Avoid negative politicking and gossiping amongst fellow co-workers/peers."[12]  Perez's second, May 8, 2014 evaluation of plaintiff's performance contained instructions that she "immediately" cease personal telephone conversations during working hours, and that "Personal cell phones [were

---

size of the electronic file.

[8] *Id.* at 17.

[9] *Id.* at 30.

[10] *Id.* at 31–33.

[11] *Id.* at 34.  Brenda Perez was previously known as Brenda Segroves.  *Id.* at 37.  She reported to Brooke Balch, who then was the Center's Chief Financial Officer.  *Id.*

[12] Doc. no. 15-3 (Perez Deposition), Ex. 5, at ECF 47.  **Note**:  "**ECF**" is an acronym formed from the initial letters of the name of a case filing system that allows parties to file and serve documents electronically (*i.e.*, "Electronic Case Filing").  *See The Bluebook, A Uniform System of Citation,*, Rule 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010).  When this court cites to pagination generated by the ECF header, it will, as here, precede the page number(s) with the letters ECF.

to] be used for emergencies only."[13]

The Center installed new accounting software during the Fall of 2014. The upgrade automated many of plaintiff's previous duties.[14] Accordingly, in order to justify plaintiff's continued employment, Perez assigned new duties to her, including the responsibility for "billing specific events" and "all of the regular accounts receivable" for which *Brenda Perez* previously had been responsible.[15]

Louie Ramirez became the Center's Chief Financial Officer during January of the following year (2015), and Brenda Perez's job title was changed from "Accounting Manager" to "Controller."[16] Plaintiff was redesignated a "Senior Accounts Receivable Specialist" and her pay was increased to $21.00 an hour.[17]

Later that year, after plaintiff had received a written reprimand for "discourtesy" on May 8, 2015,[18] she met with Perez and Vickie Henderson, the Center's Vice President of Human Resources. Henderson explained the reason for

---

[13] *Id.*, Ex. 6, at ECF 49 (alteration supplied). Plaintiff initially denied that Perez *discussed* that instruction with her during the process of reviewing her mid-year performance evaluation (*see* doc. no. 15-1 (Plaintiff's Deposition: Part 1), at 44-46), but subsequently acknowledged that she and Perez discussed the issue at some point. *Id.* at ECF 47. Moreover, the typewritten performance evaluation bears Brenda Perez's handwritten notation that she "discussed [the issue] w/ TR." Doc. no. 15-3 (Perez Deposition), Ex. 5, at ECF 49 (alteration supplied).

[14] Doc. no. 15-3 (Perez Deposition), at 27-28.

[15] *Id.* at 29.

[16] Doc. no. 15-1 (Plaintiff's Deposition: Part 1), at 48.

[17] *Id.* at 48-49, 51.

[18] *Id.*, Ex. 11, at ECF 86.

the reprimand: an incident that had been documented on an "Employee Disciplinary/Counseling Report" authored by a Center employee identified only as "Teen."[19]  The substantive portion of that report read as follows:

> Tamela Rabon [*sic*] from upstairs was in crew galley and scream [*sic*] out "there's a bug in my food" and then later says "oh, no it's not" but everyone heard her.  I have been told that she does things like this all the time.  She and her blonde girlfriend from upstairs do things like this all the time I am told.  She refuses piazza [*sic*] that she is served saying she wants a "Fresh One."  This not only makes foodservice look bad but also the entire museum.  Can you please speak to her.  Thank you, Teen.

Doc. no. 15-1 (Plaintiff's Deposition:  Part 1), Ex. 11, at ECF 86.  Perez noted on the form that the incident had been discussed with plaintiff, and that she would no longer be allowed to enter the "Crew Galley" or "Mars Grille":  the Center's two on-site food purveyors.[20]

Plaintiff believed the reprimand to be unfair, and met with the Center's Chief Executive Officer, Dr. Deborah Barnhart, to complain.[21]  Dr. Barnhart promised to look into the matter.  The following week, however, she told plaintiff that she had spoken with Vickie Henderson about the incident and the reprimand would stand.[22]

---

[19] *Id.* at 142. "Teen" is not otherwise identified in the record, but the context of the statement suggests that she may have been a food service employee.

[20] *Id.*, Ex. 11, at ECF 86.  The form indicates that employee comments were attached, but none are in the record.  *Id.*

[21] Doc. no. 15-1 (Plaintiff's Deposition:  Part 1), at 142.

[22] *Id.* at 143, 149-50.

Later that same year, during November of 2015, Perez reviewed the Center's

written policy on personal telephone calls and cell phone usage with all employees

of the accounting department.  The policy read as follows:

> The Center's business phones are to be used only for official business.  Personal telephone calls should be kept to a minimum so as not to interrupt the business processes.  In the instance that you do not have phone access and an emergency occurs, please have the caller contact your manager who will get the message to you immediately.
>
> If an emergency arises while you are at your workstation, contact your supervisor or manager immediately because only your manager may release you from your assigned workstation and duties.
>
> *The use of cell phones*, telephone earpieces, etc. *is prohibited during work hours* especially if working as a "front-line" employee, interacting with our guests or with trainees.  *You may use your cell phone during your break periods* ONLY.
>
> Company owned telephones, cell phones, pagers, fax machines, and copiers are to be used for official Center business purposes only.  Cell phone usage while operating Center vehicles or Privately Owned Vehicles (POV) on Center business should be used with caution.  All employees operating Center vehicles shall obey all traffic laws to include those concerning cell phones.  *Please be reminded that supervisors and managers will monitor telephone and especially cell phone usage while you are at work.*

Doc. no. 15-1 (Plaintiff's Deposition:  Part 1), Ex. 12, at ECF 87 (italicized emphasis

supplied).  Plaintiff signed a copy of the policy, thereby acknowledging that she had

read and understood

the policy on the use of company telephones and personal cell phones.

*I agree to comply with the policy as a condition of my continued employment.* I understand that failure to follow the policy will result in disciplinary action up to and including discharge from employment with the U.S. Space & Rocket Center.

*Id.* (emphasis supplied).

Plaintiff received an annual performance evaluation from Brenda Perez on December 8, 2015.[23] She was rated on specific, but largely subjective, criteria in the areas of "Job Knowledge & Performance," "General Requirements," "Professional Standards," and "Teamwork Standards."[24] Perez entered comments under three of the four categories. She recorded the following statements under the category labeled "Job Knowledge & Performance":

> Tamela had several complaints filed in the spring of 2015 regarding being discourteous to food service staff. Disciplinary action was taken on 5/7/2015 and Tamela was instructed to stay away from the Crew Galley/Mars Grille. I have had no further complaints from food staff members. However, there have been complaints regarding Tamela's behavior in the Accounting suites relating to the volume of her conversations and constant negative attitude. I have counseled her on this behavior and will monitor the progress over the coming months.

Doc. no. 15-1 (Plaintiff's Deposition: Part 1), Ex. 13, at ECF 88. Perez recorded the following statements under the category labeled "Professional Standards":

> Tamela communicates effectively with customers but needs to improve on her interactions with co-workers. Her outspoken negativity regarding

---

[23] *Id.* at 55.

[24] *Id.*, Ex. 13, at ECF 88-89.

[the Center] is a problem that effects [*sic*] her co-workers. She has been counseled to keep her opinions to herself and to work quietly and efficiently.

*Id.* (alteration supplied). Perez observed under the "Teamwork Standards" category that "Tamela displays a negative attitude at times which effects [*sic*] other employees."[25] In addition, Perez remarked that

> *Tamela has spent too much time on personal phone calls which are disrupting to the other accounting staff members.* She has been instructed to refrain from all personal calls in the accounting office. *The Center's Cell Phone policy has been reviewed with Tamela in November 2015*, and she has been given permission to have one personal phone call in the morning (15 min) and one in the afternoon (15 min) that must be made outside the accounting suites. Tamela needs to display a more professional demeanor by avoiding negative comments and respecting her co-workers' need for a calm and quite [*sic*] work area.

*Id.* at ECF 89 (emphasis supplied). Perez's overall rating of plaintiff on the December 8, 2015 performance evaluation was only 46%[26] — a score that fell within the range designated as "Needs Major Improvement."[27] Plaintiff denied that she had been counseled on the issues recorded in her annual performance evaluation, but admitted that her signature appeared on the form which documented the issues.[28] Brenda Perez subsequently attached the following note to plaintiff's evaluation form:

---

[25] *Id.*

[26] How this percentage was calculated is not explained.

[27] *Id.* at ECF 89.

[28] Doc. no. 15-1 (Plaintiff's Deposition: Part 1), at 58-61.

9

> I met with Tamela briefly to review her written annual performance [evaluation]. We again discussed our policy on personal phone calls. I reiterated to her that she was to make no personal phone calls in the accounting offices. She looked at me but did not respond.
>
> Tamela signed her evaluation and left my office.

Doc. no. 15-3 (Perez Deposition), Ex. 9, at ECF 54 (alteration supplied); *see also id.* (Perez Deposition), at 104.

Plaintiff was absent from her office for two-and-a-half hours, from 1:31 p.m. until 4:01 p.m., on Wednesday, February 17, 2016.[29] Perez annotated plaintiff's time-sheet with a hand-written note stating that plaintiff had "no prior approval [for the absence, and she] gave no explanation for being gone for 2 ½ hours for lunch."[30] Plaintiff denied that assertion during her deposition, and testified that, prior to leaving the office, she had told Perez that she had an appointment for a medical test, and that Perez had responded: "It's fine. Go ahead."[31] There is no evidence in the record that any formal counseling occurred as a result of plaintiff's extended absence.

Nine days after the foregoing incident, however (*i.e.*, on Friday, February 26, 2016), the Center posted an opening for the position of "Accounting Supervisor."[32] Plaintiff attempted to apply for the position through the Center's on-line job

---

[29] Doc. no. 15-3 (Perez Deposition), Ex. 10, at ECF 55.

[30] *Id.* (alteration supplied).

[31] Doc. no. 15-1 (Plaintiff's Deposition: Part 1), at 67-68.

[32] *Id.* at 69.

application system, but was unsuccessful. When she attempted to enter her application, the computer program indicated that the posting was "closed." In contrast, the posted position announcement stated that the vacancy was to remain "open" until Wednesday, March 2.[33] Consequently, plaintiff and a co-worker named Andrea Thrasher met with Louie Ramirez, the Center's Chief Financial Officer. Plaintiff complained about her inability to submit an on-line application, and Thrasher voiced concerns about her duties as the Accounts Payable Clerk.[34] Ramirez told plaintiff that he would "get back" with her about her inability to submit an on-line application for the Accounting Supervisor position, but he did not do so. Plaintiff not only failed to follow up with Ramirez on the issue,[35] but she also did not complain to Brenda Perez about her inability to apply for the Accounting Supervisor position after Perez returned to work.[36]

Notwithstanding the fact that plaintiff did not actually submit an application for the Accounting Supervisor position, she possessed neither experience in nor

[33] *Id.* at 71. Defendant produced evidence of the successful use of the computer program by Patricia Kimberlin, who ultimately was selected for the position. Doc. no. 15-19 (Landman Deposition), Ex. 21, at ECF 14.

[34] *See* doc. no. 15-1 (Plaintiff's Deposition: Part 1), at 76. Apparently, plaintiff and Thrasher met with Ramirez, rather than Brenda Perez, because Perez was absent from work that day, and there was no human resources department employee available. *Id.* at 77.

[35] *Id.* at 80.

[36] *Id.* at 79. Perez confirmed that plaintiff never told her that she had either wanted to, or had attempted to, submit an on-line application for the position. Doc. no. 15-3 (Perez Deposition), at 77.

knowledge of several of the qualifications required for the position.[37]  For example, plaintiff testified during deposition that:  she had not created and managed balance sheets; she was not familiar with generally accepted accounting principles; she had not created or managed financial statements; she had not directed an audit; she was "not sure" what information was recorded on a balance sheet; and, she did not know how to reconcile a general ledger.[38]

Patricia Kimberlin, a white female employed in the Center's accounting department, was selected for the Accounting Supervisor position.  Perez announced Kimberlin's selection during a staff meeting on March 2, 2016.[39]  While doing so, Perez also stated her belief that "the Accounting suites had become too noisy,"[40] and directed a rearrangement of the cubicles and office furniture.[41]  Plaintiff's cubicle was moved to the back of the suite, about seven feet from its prior location.[42]  Plaintiff testified that, after the rearrangement, employees from other departments came to see

---

[37] Doc. no. 15-1 (Plaintiff's Deposition:  Part 1), at 85-89, 98.  For the qualifications and duties required for the Accounting Supervisor position, *see id.*, Ex. 15, at ECF 91-93.

[38] *Id.* (Plaintiff's Deposition:  Part 1), at 86-89, 91.

[39] *Id.* at 89, 91-93; doc. no. 15-2 (Plaintiff's Deposition:  Part 2), Ex. 17, at ECF 13.

[40] Doc. no. 15-1 (Plaintiff's Deposition:  Part 1), at 92.

[41] *Id.* at 95.

[42] *Id.* at 102; doc. no. 15-3 (Perez Deposition), at 73.  Plaintiff took photographs of the suite's arrangement before and after her cubicle was relocated.  Doc. no. 15-1 ( Plaintiff's Deposition:  Part 1), at 112-21; doc. no. 15-13 ("Accounting Office Photographs"), at ECF 2-4.

where her cubicle had been moved.[43]  According to plaintiff, those employees laughed and made comments that she considered "discriminatory" and "humiliating."[44]

Plaintiff voiced her dissatisfaction with the rearrangement to Perez, but she did not say that, in her opinion, the relocation of her cubicle to the rear of the suite was *racially* motivated.[45]  Perez attempted to reassure plaintiff that the suite was rearranged in an attempt to reduce noise levels.[46]  According to plaintiff, following the rearrangement, Patricia Kimberlin, the newly-appointed Accounting Supervisor, instructed her to use the "back door" to enter and exit the office.[47]

Plaintiff believed that Perez and Kimberlin labeled her as "loud" as a euphemistic substitute for a racial comment.[48]  Even so, plaintiff testified that neither Perez nor Kimberlin specifically described *plaintiff*, as opposed to the office generally, as "loud."  Instead, plaintiff simply believed that a racially derogatory

---

[43] Doc. no. 15-1 (Plaintiff's Deposition:  Part 1), at 168-69.

[44] *Id.* at 169.  Plaintiff gave as an example of the comments:  "Oh, we heard about your move. We want to see where you were sitting at.  We wanted to see it for ourselves.  *Id.*

[45] Plaintiff testified that she told Perez that she "didn't like it [the new office arrangement]." *Id.* at 109 (alteration supplied).

[46] *Id.* at 111.

[47] *Id*. at 120.  In opposition to the motion for summary judgment, plaintiff provided declarations of co-workers who stated that they heard Patricia Kimberlin make racially insensitive comments, but there is no evidence that plaintiff heard, or was otherwise aware of, such comments, or that Perez, who made the decision to terminate plaintiff's employment, made any such comments. *See* doc. no. 17-2 (McMullin Declaration) ¶¶ 13 &14, at ECF 3; doc. no. 17-3 (Harper Declaration) ¶ 13, at ECF 3; doc. no. 17-4 (Cunningham Declaration) ¶¶ 18 & 19, at ECF 3.

[48] *See* doc. no. 15-1 (Plaintiff's Deposition:  Part 1), at 186.

sentiment was *implied* by their comments about the noise level in the suite.[49]

Plaintiff also complained about Patricia Kimberlin's annotation of the staff calendar to indicate that plaintiff was out of the office due to illness on March 28, 2015.[50] Plaintiff believed that, when other employees were absent from work due to illness, the reason for their absence was not specified on the calendar.[51] She complained to Kimberlin on some unspecified date, and Kimberlin complied with plaintiff's request to remove the annotation.[52]

During the same timeframe as the rearrangement of cubicles within the accounting suite, Perez assigned plaintiff the responsibility for maintaining the Center's petty cash.[53] That duty required her to be present in the accounting suite between the hours of 9:00 a.m. and Noon each Friday.[54] As a result, plaintiff was unable to attend the Center-wide quarterly staff meeting conducted by the Center's Chief Executive Officer with plaintiff's co-workers in the accounting department. Even so, the quarterly staff meetings were repeated in the afternoons for employees

---

[49] *Id*. at 187-88.

[50] *Id*. at 126.  *See also* doc. no. 15-2 (Plaintiff's Deposition:  Part 2), Ex. 16, at ECF 7-8. Plaintiff believes that Kimberlin did this on other occasions as well, but acknowledged that Kimberlin removed the information upon plaintiff's request. Doc. no. 15-1 (Plaintiff's Deposition: Part 1), at 126.

[51] *See* doc. no. 15-1 (Plaintiff's Deposition:  Part 1), at 129.

[52] *See* doc. no. 15-3 (Perez Deposition), Ex. 14, at ECF 61.

[53] *See* doc. no. 15-1 (Plaintiff's Deposition:  Part 1), at 153-54.

[54] *Id.*

who, like plaintiff, were unable to attend the morning session, and plaintiff attended

the afternoon meeting, albeit without her co-workers.[55] That made her feel isolated.[56]

The pertinent part of the Center's "policy and procedure statement" on

workplace harassment read as follows on the dates of the events leading to this suit:

> The US Space & Rocket Center ["USSRC"] is committed to the
> principle that all individuals should enjoy a work environment free from
> all forms of harassment including, but not limited to, sexual and physical
> harassment, intimidation and/or coercion. The USSRC is committed to
> providing a favorable environment to all individuals it serves including,
> but not limited to, trainees, families, employees, and guests.

Doc. no. 15-3 (Perez Deposition), Ex. 2, at ECF 41 (alteration supplied).[57] There was

a corresponding reporting procedure that provided:

1. Employees shall be made aware of this [harassment] policy upon
   employment and the policy shall be reviewed on a semiannual basis.

2. Any employee who believes that he/she is being harassed by a
   supervisor, co-worker, or non-employee, should promptly take the
   following steps:

   a. Discuss the situation directly with the person doing the harassing.

   b. Politely request that the person cease the harassment because it is
      offensive, uncomfortable, and/or intimidating.

   c. However, if for any reason an employee is not comfortable with

---

[55] *Id.*

[56] *Id.* at 154.

[57] The remainder of the policy in large part deals with issues related to sexual harassment. Doc. no. 15-3 (Perez Deposition), Ex. 2, at ECF 41.

confronting the individual, the employee should seek assistance from their supervisor and immediately report the situation to the Equal Employment Opportunity Officer (identified as the Director of Talent and Acquisition Development, Human Resources).

    d.  The employee may also report the incident to one of the following individuals:

        i.   Vickie Henderson, VP of Human Resources
        ii.  Louie Ramirez, VP and CFO
        iii. Brenda Carr, VP Development

3.  Any employee who has knowledge of [the] behavior of another employee which was offensive, uncomfortable, and/or intimidating is encouraged to contact his/her supervisor or one of the individuals listed in "c" above.

4.  Any supervisory personnel who has knowledge of or receives a harassment complaint shall immediately contact the EEO Officer/VP of HR so that a thorough investigation can be undertaken as set forth in Policy #1510.9A.

5.  If harassment is found to have occurred, appropriate disciplinary action will be taken up to and including termination of employment of the harassing party.

6.  If a complaint is made against a vendor or contractor, the USSRC will investigate the complaint according to Policy #1510.9A. If the investigation supports the allegations, the Center may terminate the services of the vendor or contractor.

Doc. no. 15-3 (Perez Deposition), Ex. 2, at ECF 41 (alterations supplied, telephone numbers of the individuals designated to receive reports omitted). There is no evidence that plaintiff availed herself of the foregoing harassment procedure.

Plaintiff was absent from her office from 10:41 a.m. until 1:14 p.m. on Wednesday, April 6, 2016, without prior authorization from either Patricia Kimberlin or Brenda Perez.[58] Kimberlin met with plaintiff the following day to address not only her extended absence, but other workload issues.[59] Kimberlin told plaintiff that she needed prior permission if she intended to be absent from the office for longer than an hour.[60] Plaintiff responded that she had not *planned* to be absent for more than an hour on April 6th, but she apparently did not contact Kimberlin or anyone else to report that she would be delayed in returning to work.[61] Kimberlin documented her conversation with plaintiff as follows:

> Finally I showed her a screen shot I had of her time that week. She clocked out Wednesday at 10:41 and did not return until 1:14. I thanked her for at least clocking out and not just leaving the building. *She said nothing and just stared at me.* I stated this was either an early lunch or a doctor's appointment but regardless she needed to either let me know she was leaving the building or to sign out on our calendar we have in the supply room when she is going to be away at a time that is not normally a lunch hour. *She still said nothing and just stared at me.* I said ["]people were looking for you["] and nobody had any idea where she was. *All she said was* "Who was looking for me?" I replied just people from other departments and that was why we [need to] let someone know if we're going to be out. *She didn't say anything, not okay in the future . . . or sorry I was . . . , just nothing.* Her smug attitude left me with the feeling she did not plan to let me know in the

---

[58] Doc. no. 15-1 (Plaintiff's Deposition: Part 1), at 123-25.

[59] *Id.* at 123; doc. no. 15-3 (Perez Deposition), Ex. 14, at ECF 60.

[60] Doc. no. 15-1 (Plaintiff's Deposition: Part 1), at 125.

[61] *Id.* at 126.

future her schedule.

Doc. no. 15-3 (Perez Deposition), Ex. 14 (Patricia Kimberlin's Notes), ¶ 7, at ECF 60-61 (emphasis and alterations supplied, ellipses in original); *see also* doc. no. 15-14 (Patricia Kimberlin's Notes), ¶ 7, at ECF 2-3 (same).

Plaintiff contacted the Equal Employment Opportunity Commission ("EEOC") following her meeting with Kimberlin; and, on April 6 or 7, 2016, she mailed to the Commission an "intake form" complaining about her treatment.[62] Plaintiff received a letter dated April 13, 2016 from the EEOC on April 15, 2016 — the same date that her employment was terminated.[63] That letter enclosed an "EEOC Form 5, Charge of Discrimination," which summarized the information that plaintiff had provided on the "intake form." Plaintiff was instructed to review, sign, and return the "Charge" form to the EEOC in order to initiate an *investigation* of her complaint.[64] Significantly, however, the EEOC's April 13th letter also stated that: "Because the document that you submitted to us [*i.e.*, the "intake form" mailed by plaintiff on or

---

[62] *Id.* at 135-37, 175.  There is no copy of this document in the record.  According to the EEOC's website, an "intake questionnaire" can be completed and submitted to the EEOC electronically.  *See* https://publicportal.eeoc.gov/portal/Login.aspx?ReturnUrl=%2fportal%2f (last visited August 15, 2018).  Plaintiff testified, however, that she did not submit the questionnaire online.  Instead, she mailed it to the EEOC on April 6 or 7, 2016.  She testified further that the EEOC sent her a receipt, which also is not in the record, indicating that the charge was received by the agency, she believed, on April 9th or 11th.  Doc. no. 15-1 (Plaintiff's Deposition: Part 1), at 175.

[63] *Id.* at 177.

[64] Doc. no. 15-2 (Plaintiff's Deposition:  Part 2), Ex. 20, at ECF 30.

about April 6 or 7] constitutes a charge of employment discrimination, we have complied with the law *and notified the employer that you filed a charge.*"[65]

The EEOC's notice that plaintiff had submitted an intake form (the "Charge Notice") was received by Vickie Henderson, the Center's Vice President of Human Resources, on Monday, April 18, 2016.[66] Plaintiff's employment, however, had been terminated by Brenda Perez three days before, on Friday, April 15, 2016.

The termination occurred in the office of Derrik Landman, the Center's Director of Talent Acquisition and Development.[67] Perez testified that, a couple of days prior to April 15, 2016, she had attempted on several occasions to speak with plaintiff about Center business, but each time that Perez approached plaintiff's desk, plaintiff was engaged in personal telephone calls.[68] That frustration fed Perez's decision to terminate plaintiff's employment.[69] Perez testified that she had regularly consulted her supervisor, Louie Ramirez, and Vickie Henderson, the Vice President of Human Resources, about plaintiff's performance and conduct issues,[70] and before

---

[65] *Id.* (alteration and emphasis supplied).

[66] *See* doc. no. 27-1 (Henderson Declaration), ¶ 4, at ECF 2-3; *see also id.*, ¶ 5 ("When I received the Charge Notice on April 18, 2016, I marked it as 'Received' and signed it."); *id.*, Ex. A (Charge Notice), at ECF 5 (bearing handwritten inscription on bottom of page reading "Received Monday, April 18, 2016 Vickie Henderson").

[67] *See* doc. no. 15-2 (Plaintiff's Deposition: Part 1), at 132-33.

[68] Doc. no. 15-3 (Perez Deposition), at 23.

[69] *Id.*

[70] *Id.* at 20.

actually terminating plaintiff's employment, Perez also sought advice from Louie Ramirez.[71]  He told Perez that it was "her decision" to make.[72]

The "Termination of Employment" form completed by Perez identified the reason for firing plaintiff as her "insubordination and lack of respect for co-workers."[73]  Even though that form states that "[i]nvoluntary termination of a full-time employee must have approval of the President/CEO, the appropriate Vice President of the Department and be coordinated with the Vice President of Human Resources,"[74] it does not appear that Perez complied with all of those requirements. (The initials "VH" and date "4/18/16" appear on the line adjacent to "Reviewed by V.P. of HR."[75])

During deposition, Perez recited the following as examples of the reasons she considered plaintiff's conduct to be unacceptably insubordinate:

> Refusing to answer where she had been when she left numerous times. I mean for a long time during the day without permission.  Refusing to answer from her boss, you know, why she was gone or where she was. Refusing to do duties of her job, such as calling in the credit cards, et cetera.  Refusing to stop having personal calls in the accounting suites. Asking her to not speak loudly and be disruptive in the accounting

---

[71] *Id.* at 20-21.

[72] *Id.* at 22.

[73] Doc. no. 15-16 ("U.S. Space & Rocket Center Termination of Employment" form for "Permanent Termination or Layoff More Than 4 weeks").

[74] *Id.* (alteration supplied).

[75] *Id.*

suites. Refusing to stop talking on her cell phone. . . . Refusing to stop talking on the speakerphone in the accounting suites.

Doc. no. 15-3 (Perez Deposition), at 35-36 (ellipsis supplied). Insubordination was not the only justification cited by Perez for plaintiff's dismissal, however. She also testified that Joy McMullin, Patricia Kimberlin, and Andrea Harper had complained of being distracted by plaintiff's conduct, and that a fourth employee, Angela Thrasher, requested permission to wear earphones as a means of drowning out the disruptive noise created by plaintiff.[76] In addition, employees from the Center's Sales Department entered the accounting suite and sought out plaintiff for the purpose of complaining about "their jobs or their bosses or the Center."[77] According to Perez, those visits also contributed to distracting noise levels in the accounting suite.[78]

Plaintiff formalized her charge of discrimination on April 18, 2016, three days after her termination, and it was received by the EEOC on April 19, 2016.[79] Her formal charge read as follows:

I am Black. I began my employment with the above named company in February 1999, as an Accounting Clerk. I am currently employed as a Senior Accounts Receivable Specialist in the Accounting Department. On February 28, 2016, I was informed that an Accounting Supervisor position had been posted to the employer's internal website

---

[76] Doc. no. 15-3 (Perez Deposition), at 37-38.

[77] *Id.* at 38.

[78] *Id.*

[79] Doc. no. 15-2 (Plaintiff's Deposition: Part 2), Ex. 17, at ECF 13.

and I attempted to apply for the position on-line. I attempted to submit my application electronically and I received an automated response informing me that the position was closed. When I complained to Company Vice President/CFO Louie Ramirez, he asked if I was qualified for the position and I stated "yes." Mr. Ramirez then asked if I was experienced in Foundation Accounting. At that time I told Mr. Ramirez that I would like the opportunity to apply for the Accounting Supervisor position. Mr. Ramirez stated that he would ask someone in Human Resources why the position was only posted for a few minutes and he would let me know.

Mr. Ramirez began a conversation with another employee about the new Senior Accounts Payable employee who would start on March 7, 2016. At that time, Mr. Ramirez stated that it had just dawned on him that the position that I wanted to apply for was the same position as the new Senior Accounts Payable employee. Mr. Ramirez stated that Human Resources must have posted the Accounting Supervisor position as a technicality.

On March 2, 2016, the department was informed that current employee Patricia Kimberlin (White) would be the new Accounting Supervisor and that Joy McMullin (Black), an external candidate, would be the new Senior Accounts Payable employee.

On March 3, 2016, my cubicle was moved to the back of the office. I am now isolated from my coworkers. I complained of being isolated to Ms. Perez and she informed me that the move was aimed at trimming down the noise level. I do not believe that the noise level has decreased.

I believe that I have been subjected to discrimination because of my race (Black) in violation of Title VII of the Civil Rights Act of 1964, as amended.

Doc. no. 15-2 (Plaintiff's Deposition: Part 2), Ex. 17, at ECF 13-14.

Derrik Landman, the Center's Director of Talent Acquisition and Development,

testified that he received notice of plaintiff's formal charge from Vickie Henderson, the Center's Vice President of Human Resources, during the week following plaintiff's termination.[80]  Plaintiff testified that, a couple of weeks after her termination, Veretta Cunningham, a co-worker, told her that Landman had said plaintiff was terminated because she filed an EEOC charge.[81]  That statement, of course, is classic hearsay.  Moreover, Landman denied that statement in sworn testimony, saying that he

> never discussed [plaintiff's] termination, the reason for her termination, or any of her other personnel issues with Veretta Cunningham (the Center's payroll manager and Tamela's former coworker) or any other employees at the Center. . . .  I never told Veretta Cunningham or anyone else that Tamela's termination was in any way related to her filing a charge or otherwise communicating with the Equal Employment Opportunity Commission.

Doc. no. 15-20 (Landman Declaration), ¶¶ 7-8, at ECF 3 (alteration and ellipsis supplied).

Nonetheless, as a result of Cunningham's accusation, plaintiff filed another EEOC charge of discrimination on April 25, 2016.[82]  It charged retaliation, and read as follows:

---

[80] Doc. no. 15-19 (Landman Deposition), at 21-22.

[81] Doc. no. 15-1 (Plaintiff's Deposition:  Part 1), at 179.  Plaintiff submitted Veretta Cunningham's declaration in opposition to the motion for summary judgment, but there is no mention of this conversation.  *See* doc. no. 17-4 (Cunningham Declaration).

[82] Doc. no. 15-2 (Plaintiff's Deposition:  Part 2), Ex. 18, at ECF 15.

I filed a previous charge (420-2016-01857) based on race discrimination on or about April 19, 2016; however, my employer was informed of my intent to file a charge of discrimination on or about April 14, 2016.

I was discharged on April 15, 2016, by Controller Brenda Perez. The reason given for my discharge was negative actions toward the workplace.

I believe that I have been subjected to retaliation for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, as amended.

Doc. no. 15-2 (Plaintiff's Deposition: Part 2), Ex. 18, at ECF 15.

The EEOC dismissed both charges on December 9, 2016, and mailed plaintiff notice of her right to sue.[83]  She commenced this action on March 9, 2017.[84]

## III.  ANALYSIS

By offering no response to defendant's argument that Eleventh Amendment immunity required summary judgment to be entered in its favor on those racially hostile work environment and retaliation claims that plaintiff had based upon 42 U.S.C. § 1981, plaintiff effectively abandoned those claims.  Issues and contentions not raised in a party's brief are deemed abandoned.  *See, e.g.*, *Chapman v. AI Transport,* 229 F.3d 1012, 1027 (11th Cir. 2000) (*en banc*) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling

---

[83] Doc. no. 1 (Complaint), Ex. A.

[84] *Id.* (Complaint).

and presenting their evidence before summary judgment is granted, not afterwards.");

*Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him. There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations and internal quotation marks omitted). Accordingly, Counts I and II of plaintiff's Complaint are due to be dismissed.

Plaintiff's supplemental state law claim for negligent hiring, retention, and supervision (Count V of the Complaint) also is due to be dismissed for the same reason.

Moreover, plaintiff failed to pursue any claims based upon her unsuccessful application for the position of Accounting Supervisor, and all claims related to that

event also are deemed abandoned.

Plaintiff's remaining Title VII claims for a hostile work environment, disparate treatment, and retaliation are addressed in the following sections.

## A.     Hostile Work Environment

A *prima facie* racially-hostile work environment claim requires proof of five elements: (1) plaintiff belongs to a protected racial group, African-American; (2) she was subjected to unwelcome harassment; (3) the harassment was based upon plaintiff's race; (4) the harassment was sufficiently severe or pervasive to alter the terms or conditions of plaintiff's employment, and created a discriminatorily abusive working environment; and (5) plaintiff's employer is liable for the environment under a theory of either direct or vicarious liability. *See, e.g.*, *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002).

Plaintiff cannot satisfy all the elements of a *prima facie* case because she cannot prove that she suffered harassment based upon her race. "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . . *because of* . . . [race].'" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998) (emphasis and ellipses supplied, first alteration in original, second alteration supplied); *see also Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1253 (11th Cir. 1999) ("Title VII was never intended to protect employees from

all unpleasant and rude conduct in the workplace.") (Edmondson, J., concurring).

The "'critical issue,'" according to the Supreme Court, "'is whether members of one [race] are exposed to disadvantageous terms or conditions of employment to which members of the other [race] are not exposed.'" *Oncale*, 523 U.S. at 80 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 25 (1993) (Ginsburg, J., concurring)) (alterations supplied). "[U]nfair treatment of an employee, standing alone, does not make out a Title VII case; *the mistreatment must be because the employee was [African-American]*." *Bell v. Crackin' Good Bakers, Inc.*, 777 F.2d 1497, 1504 (11th Cir. 1985) (Hill, J., concurring in part; dissenting in part) (emphasis and alterations supplied).

Plaintiff contends that she was subjected to harassment based upon her race because she *subjectively believed* that Perez's and Kimberlin's description of her as "loud" was a euphemistic reference to her race (African-American), and that their racial prejudice led them to: admonish her to cease personal telephone calls and conversations in the accounting suite; move her cubicle to another location within the suite; require her to use the back entrance to enter and exit the suite; monitor her activities; and, note the reason for her absence from work on the staff calendar. She also *believed* that other Center employees mocked her after her cubicle had been relocated because of her race. Even so, there is no objective evidence whatsoever

indicating that any of those actions were based on plaintiff's race.

Plaintiff *has* submitted evidence in the form of declarations of co-workers that *Kimberlin* made racially insensitive remarks, but there is no evidence that *Perez*, the supervisor who made the decision to terminate plaintiff's employment, harbored a racial animus. Moreover, the statements of plaintiff's co-workers constitute inadmissible hearsay under Federal Rule of Evidence 801, and may not be considered. *See Macouba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999).

Plaintiff also cannot prove that the harassment she allegedly endured was sufficiently severe or pervasive to alter the terms and conditions of her employment. The "severe or pervasive" element contains both an objective and a subjective component. To satisfy that element, plaintiff must show *both* that she subjectively believed the environment to be hostile or abusive, *and*, that a reasonable person also would perceive it as such. *See, e.g., Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22 (1993). When evaluating the objective severity of offensive conduct, courts examine the totality of circumstances, including such factors as: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interfered with plaintiff's work performance. *See, e.g., Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 509 (11th Cir. 2000)

(citing *Mendoza v. Borden,* 195 F.3d 1238, 1246 (11th Cir. 1999)). It is not necessary to prove each of the factors individually. However, the factors, taken together, must reveal conduct that is so extreme that it caused a material change in the terms and conditions of plaintiff's employment, and created a working environment that a reasonable person would find discriminatorily abusive. *See, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (citations omitted).

Here, the behavior to which plaintiff was subjected, taken as a whole, simply does not add up to a hostile and discriminatorily abusive work environment. The severity factor does not weigh heavily in plaintiff's favor. None of the actions she complained of can be considered extreme, in the sense of working a material change in the terms and conditions of her employment. The rearrangement of the office suite, the direction to cease personal telephone calls in the suite, and the monitoring of plaintiff's activities were legitimate efforts by Perez to maintain a productive working environment. When plaintiff complained to Kimberlin about notation of her personal information on the staff calendar, Kimberlin promptly complied with her request to remove it. Finally, while plaintiff may have felt humiliated by the comments and laughter of employees about the relocation of her cubicle, that conduct was not sufficiently severe to meet the legal standard. Defendant's motion for summary judgment on plaintiff's hostile work environment claim is, therefore, due to be

granted.

**B.    Disparate Treatment**

Plaintiff claims that she was subjected to race-based disparate treatment when the cubicles in the accounting suite were rearranged and her cubicle was relocated to the back of the suite.  She does not claim to have direct evidence of a race-based discriminatory animus.  Therefore, she must prove her claims with circumstantial evidence, navigating the burden-shifting framework first set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  Under that analytical framework, a plaintiff must first establish a *prima facie* case of disparate treatment in order to create a presumption of discrimination.  To rebut the presumption, the employer must articulate a legitimate, nondiscriminatory reason for the disputed employment action. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for unlawful discrimination.  *See McDonnell Douglas,* 411 U.S. at 802-05; *Burdine,* 450 U.S. at 252-56.

To establish a *prima facie* case of disparate treatment based upon her race, plaintiff must show that (1) she is a member of a protected class, African-American; (2) she was subjected to an adverse employment action; (3) her employer treated

30

similarly situated white employees more favorably; and (4) she was qualified to perform the duties of her job. *See, e.g., McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008); *EEOC v. Joe's Stone Crab, Inc*., 220 F.3d 1263, 1286 (11th Cir. 2000). Plaintiff cannot establish the second element: that the relocation of her cubicle to the rear of the accounting suite amounted to an adverse employment action.

An employment action is considered sufficiently "adverse" to be actionable under federal discrimination statutes only if it results in some *tangible*, *negative effect* on the plaintiff's employment. *Cf. Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761(1998) (holding in the context of a Title VII sexual harassment claim, that "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits") (alteration supplied). The fundamental principle is that Title VII is not a "general civility code"; accordingly, it does not protect employees from "the ordinary tribulations of the workplace." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). It follows, therefore, that an employment action does not become actionably *adverse* "merely because the employee dislikes it or disagrees with it." *Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting *Perryman v. West*, 949 F. Supp. 815, 819 (M.D. Ala. 1996)); *accord McCoy v. Macon Water*

*Authority*, 966 F. Supp. 1209, 1220 (M.D. Ga. 1997). Neither "every unkind act,"[85] nor "everything that makes an employee unhappy,"[86] amounts to an *adverse* employment action. "Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996) (Posner, C.J.) (*quoted with approval in Doe*, 145 F.3d at 1449).

Stated somewhat differently, a plaintiff's subjective feelings and personal reactions are not the complete measure of whether a contested employment action is sufficiently "adverse" to be actionable under federal employment discrimination statutes. If a plaintiff's individualized response to an employer's decision was the test for determining "adversity," then "the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee. . . ." *Gupta v. Florida Board of Regents*, 212 F.3d 571, 586 (11th Cir. 2000).[87]

---

[85] *Doe v. Dekalb County School District*, 145 F.3d 1441, 1449 (11th Cir. 1998) (quoting *Wu v. Thomas*, 996 F.2d 271, 273 n.3 (11th Cir. 1993) (*per curiam*)).

[86] *Doe*, 145 F.3d at 1450 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)); *see also Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996) ("not everything that makes an employee unhappy is an actionable adverse action.").

[87] Indeed, the Eleventh Circuit panel deciding *Doe v. Dekalb County School District* "found no case, in this or any other circuit, in which a court explicitly relied on the subjective preferences of a plaintiff to hold that that plaintiff had suffered an adverse employment action." *Doe*, 145 F.3d at 1448 (footnote omitted); *see also id.* at 1449 (reiterating that "no panel of this circuit has ever listed a plaintiff's particular subjective preference as a basis for its holding that a transfer was adverse") (footnote omitted).

Ultimately, a plaintiff must show a *serious and material* change in the terms, conditions, or privileges of her employment, and the plaintiff's subjective view of the significance of her employer's action is not controlling; rather, it must be demonstrated that a reasonable person, placed in the plaintiff's same position, would have viewed the contested employment action as materially adverse under the circumstances, before it may be said to rise to the level of an actionable, "adverse" employment action. *See, e.g.*, *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001). *Cf., Doe*, 145 F.3d at 1449 ("An ADA plaintiff must demonstrate that a reasonable person in his position would view the employment action in question as adverse."). "Any adversity must be material; it is not enough that a transfer[, or any other contested employment action,] imposes some *de minimis* inconvenience or alteration of [the terms, conditions, privileges, or] responsibilities [of the plaintiff's job position]." *Doe,* 145 F.3d at 1453 (citing *Crady v. Liberty National Bank and Trust Co*., 993 F.2d 132, 136 (7th Cir. 1993)) (alterations supplied); *see also Davis*, 245 F.3d at 1239 ("Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job *in a real and demonstrable way*.") (emphasis supplied). In other words, employment decisions that fall short of "patently adverse" employment actions — defined as "a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) — "must meet 'some threshold level of substantiality . . . to be cognizable'" under Title VII. *Gupta*, 212 F.3d at 587 (quoting *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998)); *see also Smith v. Alabama Department of Public Safety*, 64 F. Supp. 2d 1215, 1221-22 (M.D. Ala. 1999) (finding that Title VII plaintiff could not establish adverse employment action, because he suffered no loss in pay, benefits, or classification, only great embarrassment). "In sum, [the plaintiff] must demonstrate that a reasonable person in [her] position would have found the transfer [or other contested employment action] to be adverse under all the facts and circumstances." *Doe*, 145 F.3d at 1453 (alterations supplied).

Plaintiff has failed to demonstrate that the rearrangement of cubicles within the accounting suite constituted a serious and material change in the terms, conditions, or privileges of her employment. She clearly was unhappy with the new location of her cubicle, but that change can only be characterized as *de minimis*. While she may have felt isolated due to the suite's reconfiguration, her subjective reaction is not enough to satisfy that element of a *prima facie* case. Accordingly, plaintiff cannot establish that she was subjected to race-based disparate treatment, and summary

judgment is due to be granted in defendant's favor on plaintiff's disparate treatment claim.

## C.    Retaliation

"Retaliation is a separate violation of Title VII." *Gupta*, 212 F.3d at 586. Section 704(a) of Title VII of the Civil Rights Act of 1964 provides protection for employees who oppose or participate in activities to correct an employer's discriminatory practices.

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (alteration and ellipsis supplied).  Congress thus recognized two predicates for retaliation claims:  one for *opposition* to discriminatory practices, and another for *participation* in protected activity.

> Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." . . . And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

*Equal Employment Opportunity Commission v. Total System Services, Inc.*, 221 F.3d

1171, 1174 (11th Cir. 2000) (citations omitted).

The filing of a formal charge of discrimination with the EEOC is protected under the "participation clause." *See, e.g., Berman v. Orkin Exterminating Co*., 160 F.3d 697, 702 (11th Cir. 1998). That clause protects actions and statements that "occur in conjunction with or after the filing of a formal charge with the EEOC." *Total System Services, Inc.*, 221 F.3d at 1174 (citation and footnote omitted). Plaintiff met that burden by filing an "intake form," which the EEOC construed as a charge of discrimination.

In addition to showing that she participated in protected activity, a plaintiff must establish that she suffered an adverse employment action, and that the adverse employment action was causally related to the protected activity. *See, e.g., Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012). "To establish a causal connection, a plaintiff must show that the relevant decisionmaker was 'aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated." *Kidd v. Mando American Corp*, 731 F.3d 1196, 1210 (11th Cir. 2013) (quoting *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).

When causation is based upon temporal proximity, the Supreme Court has observed that the temporal gap between the protected activity and the subsequent

adverse employment action must be "very close."  *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), and citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997), and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992), for the proposition that three- and four-month gaps, respectively, between an employer's knowledge of protected activity and an adverse employment action are not sufficiently close to serve as circumstantial evidence of a causal relationship between the two events).[88]

Here, plaintiff alleges that she mailed to the EEOC an "intake form" describing her complaints of discrimination on April 6 or 7, 2016, and that she received a letter dated April 13, 2016 from the EEOC on April 15, 2016 — the same date on which her employment was terminated by Brenda Perez.  That letter stated that the EEOC had construed the information included in her "intake form" as a charge of

---

[88] In full text, the Supreme Court's statement in *Breeden* is as follows:

The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close." *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001).  *See e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient).  Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Clark County School District v. Breeden*, 532 U.S. 268 (2001) (*per curiam*).

discrimination, and that, in accordance with applicable regulations, *her employer had been notified*. The EEOC is required to notify a complainant's employer that a charge of discrimination has been filed within ten days of its receipt. *See* 29 C.F.R. § 1601.14. Based on that regulatory requirement and the April 13th letter from the EEOC, plaintiff argues that defendant must have received notice of her discrimination complaint prior to the date of her termination (Friday, April 15, 2016). However, objective evidence does not support that contention.

Vickie Henderson, the Center's Vice President of Human Resources, declared under penalty of perjury that she received the EEOC's Charge Notice on Monday, April 18, 2016 — three days after plaintiff had been terminated.[89] Henderson "informed Brenda Perez of Ms. Raybon's Charge a few days after [she] received it."[90]

Plaintiff's contention that Veretta Cunningham told her that Derrik Landman said that plaintiff had been fired because she filed an EEOC charge is inadmissible hearsay. It also is not supported by the declaration of Veretta Cunningham submitted by plaintiff in opposition to defendant's motion for summary judgment, as well as being contradicted by Landman's sworn declaration.[91]  *Cf. Jones v. UPS Ground*

---

[89] *See* doc. no. 27-1 (Henderson Declaration) ¶¶ 4-5, at ECF 2-3.

[90] *Id.*, ¶ 7, at ECF 3 (alteration supplied). The notice from the EEOC is dated April 14, 2016. *Id.*, Ex. A, at ECF 5.

[91] *See* doc. no. 15-20 (Landman Declaration) ¶¶ 8-9, at ECF 3.

*Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (holding that hearsay may not be considered at the summary judgment phase when "the declarant has given sworn testimony during the course of discovery that contradicts the hearsay statement").

Although there is close temporal proximity between plaintiff's submission of an intake form to the EEOC and the subsequent termination of her employment, plaintiff has failed to establish that the supervisor who terminated her employment possessed knowledge that she had initiated the process for filing a formal charge of discrimination. Without evidence of that linkage, plaintiff cannot show that her termination was causally related to her protected activity. Moreover, the Eleventh Circuit has held that,

> in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity, temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation. *Cf. Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006) (citing *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272, 121 S. Ct. 1508, 1510-11, 149 L. Ed. 2d 509 (2001)).

*Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006). Here, defendant presented evidence that Perez had contemplated terminating plaintiff's employment before plaintiff engaged in protected activity. Perez testified that plaintiff's performance and conduct began to deteriorate during the Fall of 2014, when the new accounting

software eliminated many of plaintiff's duties.[92] Her attitude deteriorated further when Kimberlin was hired as the Center's Staff Accountant in the Spring of 2015.[93] During May of 2015, plaintiff was disciplined by Perez and Henderson and banned from the Center's food service area for inappropriate behavior. Perez evaluated plaintiff's overall performance as "Needs Major Improvement" in December of 2015, and counseled her to cease making personal telephone calls in the accounting suite.[94] During the weeks leading up to plaintiff's termination, Perez sought advice from the Human Resources department to address plaintiff's behavior.[95] Perez testified that she made the final decision to fire plaintiff a couple of days before she executed the decision on April 15, 2016, due to plaintiff's course of conduct and her continued disregard of her instruction to refrain from personal telephone calls in the office.[96]

For all of the foregoing reasons, summary judgment is due to be granted on plaintiff's Title VII retaliation claim.

## IV. CONCLUSION

A separate judgment in accordance with this memorandum opinion will be entered contemporaneously herewith.

---

[92] Doc. no. 15-3 (Perez Deposition), at 55.

[93] *Id.*

[94] *Id.,* Ex. 9.

[95] Doc. no. 15-3 (Perez Deposition), at 20.

[96] *Id.* at 23.

**DONE** this 31st day of August, 2018.

_____
United States District Judge